And I'm going to start with the first case, which is Bryant v. Ehenico. Good morning, Lawrence. It is also that if this report meant it must take as true the factual contentions of a non-moving party, the Atlantean seeks an exception to this firmly set by the President, naming that testimony from a party that is not corroborated can be labeled self-serving, and therefore this report need not be credited as true. If this report gave this exception to the Atlanteans, however, in doing so, contravened clearly established law from this court. This court has made clear that an affidavit from a non-moving party that is not corroborated, or the fact that an affidavit is not corroborated, is not a basis apart from the well-shuttered rule under Rule 56, that the affidavit must be taken as true. I agree that an uncorroborated so-called self-serving affidavit is sufficient, can be sufficient to defeat summary judgment. But I understand that. I accept that. But it's not just that. You have to look at what the evidence is. In here you do have his sworn statement that he was never examined, but on the other side you have all this evidence that he was examined, including contemporaneous hospital records. And so how do you deal with that? In two parts, Your Honor. One, what the court said in Gainesville, what this court said in Gainesville, is you look to whether or not the affidavit contains sufficient factual details. If it does, then that's enough. In terms of, well, you have all this other evidence, the standard is whether the allegation that the examination dictates is so fantastic. Well, there can be some evidence. There doesn't have to be a complete absence of evidence for summary judgment to be granted. There can be some evidence. The question is whether, on the evidence that is in the record, a reasonable jury could so find or could find for the plaintiff. And on this record, could a reasonable jury find that the examinations never happened? Absolutely. If you look at Stoneybrook records, he was given medication at 8 o'clock. This corroborates his version of the facts, where he was held at Stoneybrook until about 8 o'clock, and then taken downstairs about 8.15, didn't leave until about 4.09, arrived at my chair. There was a second note in Stoneybrook, right? This is the question. Yeah, there are, I think as defendants, I didn't count them myself, but there are 11 entries showing that he arrived at the private hospital around 8. I mean, there certainly are some conflicts. You can't leave at 8 and travel 45 minutes and arrive at 8, but the exam doesn't take place until 9.30, assuming it took place. It was 9.30. And so why isn't that possible? I'm sorry. Well, I mean, you could have had him leaving at around 8. He says he left at 8.30 or a little later. What he says in Stoneybrook record is consistent with what he says. It is not so fantastical that a doctor would leave. I mean, would it be fantastical that two doctors, all these other individuals, the people who were filling out the records, presumably the eight entries that he arrived at at 8 o'clock were made by different people? They're all lying? They're all making this up? First of all, the admitted time is not to be confused with the arrival time. It says he was admitted at 8 o'clock. We learned after the study closed that that's when the papers are transferred over. It could have easily been that the note that was put in that said he arrived at 8 o'clock was made two and a half, more than two and a half hours later. The nurse could have confused him with another patient. I can tell you that Mr. Mondale and I had another patient. Well, that cuts both ways. It's quite possible there were mistakes made in the times being logged and people arriving in ambulances. You can understand that, but so. Counsel, counsel, can I? I'm sorry. Can I just, I want to squeeze in one question in your time. And I understand your argument, which is that if your client says something in an affidavit, at least for present purposes, you know, we have to accept it. If a jury would accept or reject it, it's another story. But what do you do about, I think it's on page 670 of the appendix, where the plaintiff admits, and I'm quoting, that Dr. Inaka, when evaluating the plaintiff, concluded that the plaintiff had thoughts that were not based on reality. So I understand if your client had presented a consistent and unified allegation, a factual basis saying, I was never evaluated. But what do you do when in your admission you say the plaintiff admits that when evaluating the plaintiff, the doctor reached certain conclusions. Now, you might put a different spin on it, but wouldn't you agree that on its face, those are two inconsistent statements? No, because when you look at everything that was said in the old 56.1 counter statement, you have these five instances that there was an assertion here that the doctor never evaluated. So when you read this piece together with all the other answers to the counter statement, it is clear the plaintiff has maintained consistently throughout that he was never evaluated. So you're saying that this was, the district court was obliged to read your answer in paragraph 69 as basically, well, I don't know, maybe not a transcription error, but simply an imprecision on the part of his lawyers that even though it says he admits that the doctor reached a conclusion when evaluating the plaintiff, he means he's admitting that he reached a conclusion notwithstanding whether he evaluated the plaintiff? Yes, that he reached this conclusion about the plaintiff notwithstanding the fact that he did not evaluate the plaintiff. And I need to tell you there are four ways the doctor could have gathered information without evaluating the plaintiff. No, I understand that. I'm just trying to say, was the district court entitled to take your admission at face value? Not when there were five other statements immediately around that asserted he did not evaluate. Okay. Thank you. If I may just have 30 more seconds to? To sum up, yes. Okay. There are four ways in which the doctor could have gathered information. He could have gotten it from the Stony Brook records that were sent over with him. He could have called Stony Brook and spoken to someone about it. He could have sat in on the evaluation by the admitting nurse, and this would be something that perhaps the accountant did not pick up on. Or he sent it to the waiter to speak to another individual the day after, and that dated the documents, and he will think that it happened. One of the other defendants in this case, who's not a lawyer, disappeared. The name of the defendant, Crystal Steele, admitted in her deposition that she evacuated documents. So these are all ways that could have happened. Thank you. We'll hear from your adversary. We're not hearing you. Sorry about that. May it please the court, my name is Brian Lee. I represent Drs. Iannaccio and Dr. Kahn. Before I get to my main arguments, let me just answer a couple of the points that he made right away. When he says that the patient, the Stony Brook chart said he received medication at 8 o'clock, that belies the plaintiff's own affidavit where he says at page 743 that he received the last medication at 7 o'clock. And furthermore, if you look at page 252, which is the medication reconciliation form filled out by Nurse Agata at 920 and countersigned by my client, Dr. Iannaccio, 10 minutes later, you will note that the source of the medication reflecting that the last dose was given at 1900 or 7 o'clock p.m. was from, quote, patient recall. So they got that, so the patient told them that his last medication was at 7 o'clock. So counsel, doesn't that, isn't your argument simply saying we can't believe the plaintiff because there's evidence saying the opposite? Correct. So isn't that exactly what we don't do on summary judgment? I mean, if you had 20 nuns all testifying to some fact against some other person, you don't say, well, you know, I got 20 people on the other side, now how could they be a bunch of liars? It's still a genuine issue of material fact, right? I didn't think that we just weighed them here and weighed credibility and said, these are great, great arguments for a jury, but how is that as a matter of law? I thought our standard is stuff like, you know, it has to be fantastical and it has to defy physical realities and things like that, not just, you know, the evidence is extraordinarily strong on one side but weak on the other. Right. Well, I would say that it is indeed fanciful, fantastic, and delusional. You have a patient coming into the hospital who's been diagnosed in two places now, Stony Brook and Brunswick, as having psychosis not otherwise specified, who is giving this detailed history. So I'm sorry, so we're supposed to include in our summary judgment analysis, we're supposed to credit the diagnoses as well, that he is in fact psychotic? You can credit that. And then we're supposed to carry it forward to the time when he's filling out an affidavit with his lawyer to say he's also, we should also conclude as a matter of law, that he's psychotic and delusional when filling out the affidavit? No, sir. I'm not saying that. So what has that got to do with anything? It has to do with his mental status when he's trying to remember what happened back. Right. You're asking us to credit that. Yes, I am doing that. Counselor, we said in Jeffrey's, I mean, we don't, we're all acknowledging, the overwhelming general rule is that we don't assess the credibility of the evidence presented. But there is a narrow exception to that when the plaintiff relies almost exclusively on his own testimony. And Jeffrey says in that testimony is contradictory and incomplete. So can you explain to us why that exception pertains here? How is his assertion that he was not evaluated contradictory? How is his affidavit contradictory and incomplete? Well, if you look at the papers in the hospital, when he arrived at the unit, Mr. Brooks says that he is brought to the, that it could have been backdated to 8 o'clock. Well, page 8216, it says that he was brought to the unit at 2000, which is 8 o'clock. Vital signs for this patient were taken at 8 o'clock. So I would say in light of Jeffrey's, no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegation. I thought the notion of it being contradictory means it's internally contradictory, right? So if he were to come in and say, I was evaluated by the doctor, and then the very next paragraph say, I was not evaluated by the doctor, we would have an internal contradiction. But it seems to me that when we ask whether his affidavit was contradictory, we're not asking, is it contradicted by the opposing party's evidence? Because that's the question here, right? If it is, if they are opposing each other, then we don't give anybody summary judgment. So what is in his story internally contradictory or inconsistent or incomplete? Yeah, it's, well, in his own story, I would agree that there is no inconsistencies that he has held to that story from his pleadings through this stage of the litigation. But there is an absence of corroborating evidence in the record and inconsistency, and as set forth by Judge Sotomayor in the Shabazz v. Pico case that we cite, and therefore the court may pierce the veil of the complaints and dismiss the case. Is there, with respect to the, you mentioned earlier that he was diagnosed at both hospitals as having psychosis, is there anything in the record to suggest that he was not suffering from psychosis? I do not believe so. I think all of the allegations are, all of the evaluations are consistent through both of the two hospital admissions. When you're referencing the opinion of now Justice Sotomayor, when she talks about the lack of value of self-serving affidavits, she talks about them, I think, in terms of self-serving affidavits that merely reiterate conclusory allegations in affidavit form. But if someone says, look, I never met that doctor, it just never happened, what more detail would you expect a party to give about an episode that they claim simply never happened? You're not going to give the room where it didn't happen, the time it didn't happen, the people who were not in the room when it didn't happen, right? If I say, I've never been to Minneapolis, what else would you expect me to say to give a more complete statement of the fact that I've never been to Minneapolis? You wouldn't expect me to list all the other places I've been, right? That is correct, Your Honor. So what more would you insist from him about simply saying, look, I don't know who this doctor is because I never met him? Well, I would say that there are inconsistencies in his affidavit as to the time that he arrived, and those inconsistencies. Okay, so focus on those. Tell us, what are the internal inconsistencies within his affidavit? Again, they're not internal, but they are so overwhelmingly contradicted by the record from the hospital that they are not to be believed. So you're saying they're against the weight of the evidence? Against the overwhelming weight of the evidence in this particular matter. So you're saying on this record he was consistent about the times throughout? Because I thought you said earlier that he was inconsistent. He was inconsistent with regard to the time that he arrived in the hospital. He's claiming that he couldn't have arrived before 930, and if you count them, I actually counted wrong in my brief. There's actually 12 notations in the Brunswick chart prior to that time. Again, I think you're saying he's inconsistent with evidence put forward by the hospital. So let's just be clear here. Are you saying that at any point his own story has been internally inconsistent about the times? Because that's a different question, right? Yes, Your Honor. And with respect to that, has he ever been internally inconsistent? In other words, has he told a chronology that does not hold up on its own? That even if we had no hospital records, his chronology wouldn't make any sense. No, there is no evidence in this record of that. Well, there is a reference, not in the affidavit, to being examined by the doctor. Correct. Being evaluated by the doctor, which may be different from being examined. Correct. And you also have the whole issue with Dr. Selig and his admission that the patient was evaluated and now them reneging on that as well. But Dr. Selig wasn't there, right? He never purported to be there, right? That is correct. So would he have any firsthand knowledge that could be admissible about whether or not the plaintiff was examined? He would not have any firsthand knowledge. But as a board-certified psychiatrist, looking at this chart, it is readily apparent that the patient was examined. That was the reason, no doubt, that he gave that testimony in his deposition. Would that be admissible in court? It could be admissible as an admission against the interests of the plaintiff, yes. Because he's his agent? Because he's his expert being retained to evaluate this case, yes. And is the theory that looking at the doctor's evaluation, reported evaluation, he as an expert doesn't believe it reasonable to think that a doctor could create such a report without seeing the patient? Correct. And as we set forth in detail, Dr. Iannaciu sets forth, our expert sets forth, that when he did this mental status examination, it could not have been taken from other information in the chart. He asked him specific questions and received specific answers that are documented in the original records of Dr. Iannaciu in his admission psychiatric evaluation found at page 8160. And those things are not things that he could make up. The only possibility is that Dr. Iannaciu completely fabricated everything in the record, and that is beyond belief and not subject, and just beyond belief. Thank you. We'll hear rebuttal. There's someone on the— Oh, I'm sorry. One minute. I'm basically—I represent just the hospital, and just for clarity, there are no independent claims against the hospital in this matter. It was based on pleadings, based on stipulations signed by the plaintiff and myself. We're simply sort of a hotel-like court, in a vicarious liability nature for this case. Just in terms of supporting Mr. Lee, however, when we talked about how the timing was in terms of the submission, I just want to point out there's electronic notations that they have caught in an entry, but there's also handwritten notations. So that's where you go back to this sort of incredulity about when this patient came in to you, just on a vital sign sheet, that they took the body documents specifically, not a green object, but a nurse document. She took the vital signs of the patient, which is a nursing function, at 8 o'clock, or maybe an 8 or 2, and it's handwritten. There's just absolutely no reason for a nurse— Well, aren't the electronic—wouldn't the electronic notations be more reliable? No, no. The electronic—absolutely. I guess my point is— They're both, yeah. That's the key thing in terms of— And then you'd say that the electronic notations effectively corroborate the handwritten notations. That's the idea. I would suggest the electronic and the handwritten corroborate each other. Correct. That's true. That's the basic key point I wanted to make, and I thank you for your time. Mr. Brooks? To what Mr. Mendele said, I think we have a real inconsistency between the Stony Brook practice and the Brunswick practice. There is nothing that—in the Brunswick practice that corroborates the 8 o'clock statement in the Stony Brook practice. They are internally inconsistent—they are inconsistent. And this is why—and this is a question of fact and maturity. As to the question that was chanted out, whether or not Mr. Bryant was psychotic, I think it's worth noting the testimony of the practice expert. They say he had the same symptoms at discharge as he did upon admission. But if that's the case, you would wonder why the hospital would be discharging him if there was no change. Well, my question specifically was whether—on the question of whether he was suffering from psychosis, is there anything in the record from which a jury could say, no, he was not suffering from psychosis? I'd have to go back to his testimony. But simply because when it's psychotic, or when it's not psychosis, there are old sufficient degrees. There was no change in his conduct. And he was clearly well enough with the symptoms that he had upon admission to be discharged. That's my point. It cannot have been too bad if he was discharged with the same symptoms. You know, Judge Snow, you asked whether or not Mr. Bryant—it's unnecessary to say anything more. But he did say more. He laid out in detail what happened during that time. So he did as much as he could. In terms of the suggestion that he copy—that he actually copy notes, what the plaintiff said was that he made a reference to a malady. This was clearly taken from earlier notes. Because the plaintiff said he never met Mr. Mallory or a malady. What he said was, I told the suspect and the detectives about a man named O'Rourke who once threatened me with his daughter. I don't know who his wife on the train. So the fact that Dr. DiMaggio wrote about somebody named Mallory, and it was said that it was contained in the Stonebrook notes, suggests that he was copying. And Mr. Lee had an opportunity to contradict what I said in terms of the various ways in which Dr. DiMaggio could have gathered the information. I gave him four ways. He did not challenge any of them. I think that's—I think he shows that what went on—the allegation that he was never examined was for himself and tested. And if we just—we make one more point, and that is, prior to his deposition, Dr. Selleck was not asked by me to make any sort of assessment on whether or not he was abided. I asked him to render certain opinions about Mr. Bryant's accomplices. So he was asked a question off the top of his head. He did not render records without my choice determining whether or not he was evaluated. And he gave an answer off the top of his head without any preparation. Wow. I mean, he apparently looks at the records, whether he did it carefully or not, and his reaction seemed to be, yeah, there was an evaluation or an examination. I mean, is that—is that not worth something? No, it's worth absolutely nothing. It's worth nothing. From a witness who—from an expert who's not asked about this issue before the deposition. I mean, it suggests that at least the records seem authentic. Wouldn't you agree with that? I mean, here's a look at this and say these are an obvious fabrication. The records as a whole look authentic. All hospital records look authentic. But when you read them carefully, when you read the Brunson's record in comparison to the Stoneybrook record, you see there are clear factual discrepancies. And that's why you have a trial, to clear up clear factual discrepancies. It's also the case—maybe this is not important, but after the matter is brought to his attention, your expert doesn't come forward with an evaluation. Now, I've looked at them carefully, and I think there's a question here as to whether they were evaluated. He just says, I offer no opinion, and I'll take the attorney's assumption as a fact. That's permissible to do. An expert is clearly entitled to rely upon the factual— Absolutely, but I'm just making the point that he—once you said his first opinion was uninformed, he was not focused on that issue. Once focused on that issue, he doesn't offer an opinion on it. Well, I mean, I think the outcome of the court in your honor is a beating. Whatever he thinks is an opinion, he's not an expert in—in some cases, a psychiatric expert of someone's mental state. And dangerousness, he's not an expert in terms of whether an evaluation took place. That's a thought question for a jury. Thank you all, and we will take the matter under advisement. Thank you. Thank you for your kind consideration. Appreciate it.